CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

APR 1 1 2012

JULIA C. DUDLEY, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | |
|---|---|
| DANIEL SLOAN, | Civil Action No. 7:11-cv-00143 |
| *Plaintiff*, | |
| v. | **MEMORANDUM OPINION** |
| OFFICER T. M. DULAK, *et. als.*, | |
| | By: James C. Turk |
| *Defendants*. | Senior United States District Judge |

This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 30). The Plaintiff responded, (Dkt. No. 34), oral argument was heard on April 9, 2012, and the matter is now ripe for disposition. In accordance with the following Memorandum Opinion, Defendants' motion for summary judgment is **DENIED in part and GRANTED in part**.

I.    **Background**

Plaintiff, Daniel Sloan ("Plaintiff" or "Sloan"), brought this action under the Civil Rights Act, 42 U.S.C. § 1983, alleging that Defendants,[1] Officer Christopher Burnett, Officer Robert McNiff, Officer Timothy Hartson, and Officer T.M. Dulak, violated his "right to be free from the unreasonable and excessive use of force upon his person during arrest and detention in violation of the Fourteenth Amendment...." (Dkt. No. 1 at 2). On the evening of March 25, 2009, at approximately 10:30pm, Plaintiff was stopped by Officer Burnett for driving his vehicle without

---

[1] In his Complaint, Plaintiff listed the City of Roanoke Police Department, Chief C.C. Perkins, Officer T.M. Dulak, Officer Chris Burnett, and Officer John Does as Defendants. This Court dismissed the City of Roanoke Police Department and Chief C.C. Perkins in its October 18, 2011 Order. Plaintiff never amended his Complaint to specify the names of the John Does. Based on its review of the pleadings, the Court believes the John Does are Officer Robert McNiff, and Officer Timothy Hartson.

having his headlights illuminated, in violation of Virginia Code § 46.2-1030. (Burnett Dec. ¶ 3).[2] The stop occurred in the 300 block of Orange Avenue, Roanoke, Virginia. (Id. ¶ 4).

After stopping Sloan, Officer Burnett asked for Sloan's driver's license. Sloan was not carrying his driver's license or any other form of identification, but provided Officer Burnett with a name and social security number. Officer Burnett claims Plaintiff identified himself as Michael Edward Sloan, (Id. ¶ 9), while Plaintiff claims he gave his correct name and it was only after Officer Burnett was not able to find him in the system that he mentioned his brother, Michael Edward Sloan, (Sloan Dep. at 14-16). Officer Burnett states that after running the social security number and name through DMV records and conferring with the city's 911 dispatch center, he was able to determine that the driver was, in fact, Daniel Sloan. (Burnett Dec. ¶ 11). Sometime during the process of verifying Plaintiff's identity Officer McNiff arrived on the scene. (Burnett Dec. ¶ 5; McNiff Dec. ¶ 3).

Officer Burnett informed Sloan that he was being arrested, at which point Sloan fled on foot. Sloan admits he fled, but claims he did so because he believed one of the Officers was reaching for his gun. Officer Burnett's in-car camera captured the moments before Sloan fled. Although Sloan is not visible on the video, the Officers are. The video shows one Officer placing a pen in his pocket and another Officer reach for his hip, where his radio and handcuffs appear to have been located. The video does not show either Officer reach for his gun.

Officer Burnett and Officer McNiff pursued Sloan on foot. (Burnett Dec. ¶ 15; McNiff Dec. ¶ 13). While pursuing Sloan, Officer Burnett radioed that he was involved in a foot pursuit. (Dulak Dec. ¶ 3). Both parties admit that Officer Burnett, with the assistance of Officer McNifff, tackled Sloan and pulled him to the ground; (Burnett Dec. ¶ 15; McNiff Dec. ¶ 14); however, the

---

[2] Plaintiff concedes that the Officers had probable cause to conduct a traffic stop after viewing him driving without his headlights. (Dkt. No. 36 at 1).

parties' versions of the events that immediately precede the tackle differ. Sloan claims that prior to being tackled an Officer ordered him to freeze. Sloan alleges that he complied with the Officer's order, froze, and placed his hands in the air, but despite this was tackled to the ground. (Sloan Dep. at 18). Officers Burnett and McNiff make no comment as to whether they ordered Sloan to stop prior to tackling him or whether he was stopped prior to being tackled

During the process of tackling Sloan and attempting to place him in handcuffs Officer Burnett's arm was cut and his hip bruised when his radio broke. (Burnett Dec. ¶ 18; Dulak Dec. ¶ 10). Officer McNiff also suffered a partially separated shoulder during the struggle. (McNiff Dec. ¶ 15). As a result of his injuries Officer Burnett used his radio to call for immediate assistance. (Burnett Dec. ¶ 21).

After being tackled to the ground Sloan was lying on his stomach with at least one of his arms beneath his body. (Sloan Dep. at 18). Both Officer Burnett and Officer McNiff instructed Sloan to place his hands behind his back, but he refused to comply. (Burnett Dec. ¶ 22; McNiff Dec. ¶ 19). Sloan's deposition testimony indicates he did not comply. (Sloan Dep. at 18-19).

At approximately this time the backup Officer Burnett had requested began to arrive. (Hartson Dec. ¶ 14; Dulak Dec. ¶ 5). Officer Dulak had been patrolling in the 800 block of Hunt Avenue when he heard Officer Burnett's radio call regarding the foot pursuit. While en route to Officer Burnett's location he heard Officer Burnett's request for immediate assistance. (Dulak Dec. ¶ 3). Officer Timothy Hartson ("Hartson") also heard Officer Burnett's request for immediate assistance. (Hartson Dec. ¶ 3).[3]

---

[3] Other Officers also heard Officer Burnett's request for assistance and responded to the scene. These Officers included Officer Ronnie Hodges and Officer Timothy Donothan. Officer Officer Donothan helped free Officer McNiff from the struggle, whose legs had become trapped under the suspect. (Donathan Dec. ¶¶ 7-8). Officer Hodges held Sloan's legs to keep him from kicking other Officers after Sloan had been handcuffed. (Hodges Dec. ¶ 8). It does not appear Plaintiff has made any allegations against Officers Hodges and Donathan, and thus no claims against these Officers will proceed to trial.

3

When Officer Hartson and Officer Dulak arrived on the scene they observed that Officer Burnett was bleeding from his arm and had injured his hip. (Dulak Dep. ¶ 10; Hartson Dec. ¶ 6). Officer McNiff also appeared to be in obvious pain. (Hartson Dec. ¶ 6). Officers Hartson and Dulak instructed Sloan to put his hands behind his back, but Sloan failed to comply. (Dulak Dep. ¶ 8; Hartson Dec. ¶ 9). Officer Dulak believed that Sloan was concealing a knife in his hand beneath his body, which he had used to stab Officer Burnett. Officer Dulak began striking Sloan with knee strikes to his torso to force him to comply with the instruction to place his hands behind his back. (Dulak Dec. ¶¶ 11,13). Sloan continued to refuse to comply with the Officers' instructions and, consequently, Officer Dulak struck Sloan on the head with a closed fist several times. (Dulak Dec. ¶ 12). Officer Hartson struck Sloan several times in the ribs in an effort to loosen Sloan's arm from underneath his body. (Hartson Dec. ¶ 13). Together Officers Hartson and Dulak were eventually able to pull Sloan's arm behind his back and place him in handcuffs. (Dulak Dec. ¶ 15; Hartson Dec. ¶ 15). After Sloan was placed in handcuffs Officer Dulak realized that he did not have a knife. (Dulak Dep. ¶ 16). Sloan alleges that he never refused to comply with the Officers' instructions and that in addition to the strikes to his back and head, he was also pepper sprayed.

Both Officer Burnett and Officer McNiff suffered injuries while attempting to arrest Sloan. (Burnett Dec. ¶ 17; McNiff Dec. ¶ 15). As a result of their injuries neither officer participated in the physical arrest of Sloan. (Burnett Dec. ¶ 23; McNiff Dec. ¶ 20). Both officers were treated for their injuries at the scene by the Roanoke City Fire/EMS Department. (Dulak Dec. ¶ 17; Hartson Dec. ¶¶ 17-19). Subsequently, Sloan and Officers Burnett and McNiff were transported to the hospital. (Id.). Officer Burnett incurred $1,122.42 in medical expenses and Officer McNiff incurred $1,925.54 in medical expenses. (Clewis Dec. ¶¶ 4-5).

## II. Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.) (citations omitted) cert. denied, 513 U.S. 813 (1994). A genuine issue of material fact exists when a rational factfinder, considering the evidence in the summary judgment record, could find in favor of the non-moving party. Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009). However, "[g]enuine issues of material fact cannot be based on mere speculation or the building of one inference upon another." Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984). Furthermore, "the mere existence of a scintilla of evidence in support" for the nonmovant's position will not defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). A summary judgment motion should not be granted "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Campbell v. Hewitt, Coleman, & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994). Summary judgment should be entered, however, if the Court finds, after a scrupulous review of the record, that no reasonable jury could return a verdict for the non-moving party. See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 958 (4th Cir. 1996).

## III. Analysis

Plaintiff alleges that the Officers used excessive force when arresting him. Specifically, Sloan argues that Defendants' motion for summary judgment cannot be granted because two material facts are in dispute: (1) whether Sloan was stopped or still evading police at the time he

5

was tackled to the ground and (2) whether Sloan in fact refused to comply with the Officers' instructions to place his arms behind his back. Defendants argue that the undisputed facts confirm the Officers used reasonable force to arrest Sloan and, in the alternative, that the Officers are entitled to qualified immunity. The Court agrees with Plaintiff that there is a disputed material fact as to whether Plaintiff was stopped, and if so for how long, or still evading police at the time the Officers' tackled him. However, the Court finds that there is no record support for Plaintiff's assertion that he complied with the Officers' instructions to place his arms behind his back and thus no disputed material fact. Accordingly, Defendants' motion for summary judgment is **DENIED** as to the Officers' decision to tackle Sloan and **GRANTED** as to all Officer conduct after Sloan was tackled.

Qualified immunity protects public officials, including police officers, facing liability under 42 U.S.C. § 1983, "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 55 U.S. 223, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fizgerald, 457 U.S. 800, 818 (1982)). To determine whether public officials are entitled to qualified immunity requires the court to conduct a two step analysis. First, the court considers whether "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleges show [that] the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated" even when the facts are viewed in the light most favorable to the plaintiff, the plaintiff cannot prevail. Id. Second, if a plaintiff establishes that one of his or her constitutional rights has been violated, public officials may still be entitled to qualified immunity if the constitutional right alleged to have been violated was not "clearly established" at the time of the alleged violation. Id.

6

To determine whether a constitutional right is "clearly established" the court must first define, with precision, "the right allegedly violated." Wilson v. Lane, 526 U.S. 603, 615 (1999). Once the right is defined, the court considers whether "courts have previously ruled that materially similar conduct was unconstitutional, or if the conduct was such an obvious violation of the Fourth Amendment's general prohibition on reasonable force that a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful." Raiche v. Pietroski, 623 F.3d 30, 38 (1st Cir. 2010) (citing United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotations and citations omitted)).

"It is clearly established that citizens have a Fourth Amendment right to be free from unreasonable seizures accomplished by excessive force." Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir. 2009) (citing Waterman v. Barton, 393 F.3d 471, 476 (4th Cir. 2005). In assessing claims of excessive force under the Fourth Amendment, the court must apply a standard of "objective reasonableness." Graham v. Connor, 490 U.S. 386, 395 (1989). Specifically, the court must determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Elliot v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (citing Graham, 490 U.S. at 396-97). This fact-intensive balancing test must be applied in light of the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397. To assist courts with this task, the Supreme Court offered three factors for courts to consider when determining whether a given use of force was excessive: (1) the "severity of the crime at issue," (2) whether the suspect posed an "immediate threat to the safety of the officers or others," and (3) whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." Id. at 396. The

7

court analyses the instances of force, specifically the tackle and the strikes once Sloan was on the ground, separately as different Officers were involved and the instances may have different outcomes when analyzed under the Graham factors. See Waterman, 393 F.3d at 481.

### A. The Officers' Decision to Tackle Sloan

The Court first considers whether the Officers' decision to tackle Sloan violated Sloan's constitutional rights. While it is true that the Supreme Court has recognized that "the right to make an arrest carries with it the right to use a degree of physical coercion or threat thereof to effect it," Saucier, 533 U.S. at 194 (quoting Graham, 490 U.S. at 396), that does not mean the right to use force is unlimited, Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). A disputed material fact precludes the Court from granting the Defendants' motion for summary judgment on this issue.

Construing the facts in the light most favorable to Sloan, the Court must accept Sloan's statement that at the time he was tackled he had complied with an Officer's direction to freeze and had placed his hands above his head. At oral argument counsel for Sloan suggested that Sloan was completely stopped before being tackled. The Defendants, in their written motion, did not comment on whether Sloan was actually stopped at the time he was tackled by Officers Burnett and McNiff. Instead, the Defendants focused on the fact that the Officers made a split-second decision to tackle Sloan, which in light of the fact that Sloan had evaded arrest made the tackle reasonable and not a violation of Sloan's constitutional rights. At oral argument the Defendants suggested that if Sloan had stopped it was only a moment before the Officers tackled him, reaffirming the fact that the Officers' made a split second decision to tackle Sloan. Neither party presented any evidence regarding the length of time Sloan was stopped, if he was indeed

8

stopped, prior to being tackled. Nor did either party present any evidence regarding what threat, if any, Sloan posed to the Officers' safety.

The Court finds that the factual issue of how long Sloan was stopped prior to being tackled is dispositive of whether Sloan's constitutional rights were violated and whether the Officers are nonetheless entitled to qualified immunity. Although the Fourth Circuit does not appear to have addressed this specific issue or any analogous facts, other Circuits have addressed this and analogous circumstances Raiche v. Pietroski, 623 F.3d 30 (1st Cir. 2010) (holding that tackling a stationary individual who posed no threat to officer safety was an unreasonable use of force and the officers were not entitled to qualified immunity); Blankenhorn v. City of Orange, 485 F.3d 463, 478-79 (9th Cir. 2007) (holding that tackling a suspect who refused to comply with a request to kneel down but did not otherwise actively resist being handcuffed or otherwise evade police was unreasonable and a violation of the plaintiff's Fourth Amendment rights); Wysong v. City of Heath, 260 F. App'x 848, 856 (6th Cir. 2008) (holding one has a "right to be free from physical force when one is not resisting the police").

In Raiche, a police officer stopped the plaintiff for riding his motorcycle while not wearing a helmet. Id. at 37. Although the facts were disputed, the essence of the plaintiff's excessive force claim was that the police officer forcibly removed the plaintiff from his motorcycle and tackled him to the ground, despite the fact the plaintiff had stopped his motorcycle in response to the police cruiser's flashing lights, turned off his motorcycle's engine, and had been sitting stationary on his motorcycle for approximately 15-20 seconds before being tackled. Id. at 34. Reviewing the district court's denial of qualified immunity after the jury returned a verdict for the plaintiff, the First Circuit weighed the Graham factors – noting that the absence of heated circumstances, the lack of a threat posed by the plaintiff sitting on his parked

9

motorcycle, and the absence of any indication the plaintiff was attempting to flee or resist arrest – and concluded that the Graham factors indicate that the officer's use of force was unreasonable and a violation of the plaintiff's constitutional rights. Id. at 37. Going on to address whether the officer was nevertheless entitled to qualified immunity because the right was not "clearly established," the First Circuit further stated that "[a] reasonable officer …. would not have needed prior case law on point to recognize that it is unconstitutional to tackle a person who has already stopped in response to the officer's command to stop and who presents no indications of dangerousness." Id. at 39.

Hence, in accordance with Raiche, had Sloan been stopped for a sufficient amount of time to indicate he was no longer evading or resisting arrest and posed no threat to the Officers' safety, the Officers would likely not have been justified in tackling him and would not be entitled to protection under the qualified immunity doctrine.

Conversely, if Sloan was still actively evading arrest or had only just stopped, such that the Officers did not have sufficient time to evaluate and react to Sloan's changed course of conduct, the Officers' conduct would be analyzed in accordance with Graham's protection for "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation," Graham, 490 U.S. at 397. The Officers' decision to tackle Sloan would not be an unreasonable use of force as courts have held that it is a reasonable use of force to tackle a suspect that is fleeing police. See Fontenot v. Cormier, 56 F.3d 669, 675 (5th Cir. 1995); Chappel v. Gerak, No. 11-12624, 2012 WL 1094339, at *10 (E.D. Mich. April 2, 2012). Or, in the alternative, the Officers' would be entitled to qualified immunity because this Court can find no case that squarely states tackling a suspect who has only just stopped evading arrest is a violation of a suspect's constitutional rights or that

10

general Fourth Amendment principles would give an officer notice that tackling such a suspect would be unconstitutional.

### B. The Officers' Decision to Use Physical Force to Effect Sloan's Arrest

The Court now considers whether Sloan has a constitutional right to be subjected to physical force, specifically knee strikes to the back and strikes to the face, in order to effectuate an arrest. Construing the facts in the light most favorable to Sloan, at the time Officers Dulak and Hartson arrived on the scene they saw two police officers injured and struggling to subdue a suspect, Sloan. Based on Officer Burnett's radio call, Officers Dulak and Hartson knew at some point just prior Sloan had attempted to evade arrest. Officer Dulak also observed that Officer Burnett was bleeding and that Officer McNiff was in obvious pain. According to Sloan's deposition testimony an Officer told him to "Get your hands behind you back, get your hands behind your back." (Sloan Dep. at 18). Then Officers "started kicking on me and hitting me in my face." (Id.). Although one of Sloan's arms was behind his back Sloan did not produce his other arm at this time. Indeed, when asked "it wasn't until later that you gave them your other arm," Sloan answered "Right." (Id. at 19). Thus, even viewed in the light most favorable to Sloan, Sloan did not comply with the Officers' instructions to place his arms behind his back until sometime after the Officers ordered him to put his arms behind his back.

The Graham factors require the Court to view the situation from the perspective of a reasonable officer under the same circumstances. Here, the Court cannot ignore the fact the undisputed evidence that the circumstances supported Officer Dulak's belief Sloan was armed with a knife. Both Officers Dulak and Hartson knew Sloan had evaded arrest, caused injury to both Officers Burnett and McNiff, and was continuing to resist arrest by persisting in his refusal to follow their instructions. Thus, while the first Graham factor – the severity of the crime at

11

issue – does not weigh in the Officers' favor, the second and third factors – regarding officer safety and whether the suspect was actively resisting arrest – do.

Furthermore, it is clearly established under Fourth Circuit law at the time of Sloan's arrest that it is reasonable for a police officer to use physical force, including striking a suspect with his closed fist and using mace, to subdue a suspect who resists arrest by refusing to present his hands to be cuffed. In Wilson v. Flynn, 429 F.3d 465, 469 (4th Cir. 2005), the suspect refused to present his hands so that he could be handcuffed and placed under arrest when asked to do so. As a result of his noncompliance, one of the police officers punched the plaintiff in the face and another officer sprayed the plaintiff with mace. Id. at 467. The Fourth Circuit affirmed the trial court's grant of summary judgment on the basis of qualified immunity.

The Court finds that under the established law at the time of Sloan's arrest, based on the circumstances surrounding Sloan's arrest a reasonable officer could have believed that it was necessary to use force to effectuate Sloan's arrest. Like the plaintiff in Wilson, Sloan refused to comply with the Officers' instructions to place his arms behind his back so he could be handcuffed. As a result, Officers Dulak and Hartson resorted to force to complete the arrest. Indeed, as the Fourth Circuit has previously noted, "[i]f courts refused to permit the use of proportionate force in these circumstances, we would be inviting any suspect who is unhappy about an arrest to resist that arrest in the hopes that the officers will simply desist rather than risk liability." Brown v. Gilmore, 278 F.3d 362, 369-70 (4th Cir. 2002). Therefore, Defendants are entitled to summary judgment as to Sloan's claim the Officers' used excessive force once he was on the ground. Accordingly, there are no claims against Officers Dulak and Hartson, that will proceed to trial as neither Officer was involved in the initial tackling of Sloan.

## IV. Conclusion

Because there is a factual dispute regarding whether Sloan was running or stopped, and if stopped for how long he had been stopped, at the time Officers Burnett and McNiff tackled him to the ground, such that a reasonable jury could find in the Plaintiff's favor, the Court cannot grant summary judgment with respect to this issue. However, the Court grants summary judgment with regard to the Officers' conduct once Sloan was on the ground. Accordingly, Defendants' motion for summary judgment is **DENIED in part and GRANTED in part.** The case will proceed to trial on the issue of whether Officers Burnett and McNiff used excessive force when tackling Sloan. An appropriate order shall issue this day.

ENTER: This 11th day of April, 2012

James C. Turk
Senior United States District Judge